E. MARTIN ESTRADA
United States Attorney
MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division
BRIAN R. FAERSTEIN (Cal. Bar No. 274850)
J. JAMARI BUXTON (Cal. Bar No. 342364)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3519/3819
    Facsimile: (213) 894-0141
    E-mail:    jamari.buxton@usdoj.gov
               brian.faerstein@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>CHRISTOPHER BLAIR HERNANDEZ,<br><br>　　　　Defendant. | No. 23-CR-133-PA-2<br><br>GOVERNMENT'S SENTENCING POSITION, OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT, AND MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K1.1; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBIT<br><br>**[PUBLIC VERSION – REDACTED]**<br><br>Hearing Date: January 8, 2024<br>Hearing Time: 8:30 a.m.<br>Location:　　Courtroom of the Hon.<br>　　　　　　　Percy Anderson |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Brian R. Faerstein and J. Jamari Buxton, hereby files its sentencing memorandum, objections to the Presentence Investigation Report, and motion for downward departure pursuant to U.S.S.G. § 5K1.1 for defendant Christopher Blair Hernandez.

This sentencing memorandum, objections, and motion are based upon the attached memorandum of points and authorities and accompanying exhibit, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 18, 2023          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

           /s/
BRIAN R. FAERSTEIN
J. JAMARI BUXTON
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.   INTRODUCTION....................................................1

II.  DEFENDANT'S OFFENSE CONDUCT.....................................2

III. THE USPO'S GUIDELINES CALCULATIONS.............................7

     A.   Offense Level and Criminal History Category..............7

     B.   Zero-Point Offender Reduction Does Not Apply.............8

     C.   Advisory Guidelines Range Before Departure...............9

IV.  GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE PURSUANT TO
     SECTION 5K1.1..................................................10

V.   THE GOVERNMENT'S SENTENCING RECOMMENDATION.....................16

     A.   The Nature and Circumstances of the Offense.............16

     B.   History and Characteristics of Defendant................19

     C.   Deterrence..............................................20

     D.   Need to Reflect Seriousness of Offense, to Promote
          Respect for the Law, and to Provide Just Punishment
          for the Offense.........................................21

     E.   Avoidance of Unwarranted Sentencing Disparities.........22

     F.   Victim Impact...........................................23

     G.   Restitution.............................................23

     H.   Objections/Corrections to the PSR.......................24

VI.  CONCLUSION....................................................25

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

Gall v. United States,

  552 U.S. 38 (2007) ............................................. 22

Molina-Martinez v. United States,

  136 S. Ct. 1338 (2016) ....................................... 22

United States v. Carty,

  520 F.3d 984 (9th Cir. 2008) ................................. 16

United States v. Rita,

  551 U.S. 338 (2007) .......................................... 22


**Statutes**

18 U.S.C. § 242................................................... 2

18 U.S.C. § 371................................................... 8

18 U.S.C. § 3553............................................ passim

18 U.S.C. § 3663............................................ 23, 25

18 U.S.C. § 3663A........................................... 23, 25

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

The public expects that law enforcement officers are on the side of right.  They are the first line of defense in upholding the rule of law; they are armed with immense power and responsibility in the discharge of their duties; and they are the most prevalent official presence in peoples' day-to-day lives.  Maintaining the public's trust that officers are, in fact, on the side of right is critical to law enforcement's central mission of protecting the public.

As with any relationship built on trust, it is a delicate balance.  When officers breach that trust -- especially in brazen and public fashion, as was the case with defendant Christopher Blair Hernandez's ("defendant") and his partner and co-defendant Miguel Angel Vega's ("Vega") violation of victim J.A.'s rights on April 13, 2020 -- the resulting harm goes well beyond the immediate victim of the abuse.  The public's trust in law enforcement as a whole erodes.  And the vast majority of officers, who discharge their duties in ethical and honorable fashion, not only suffer reputational harm but also confront, in their everyday duties, a public increasingly conditioned to question law enforcement's good faith.

In sentencing Vega to 24 months in prison, this Court recognized these broader implications of the grave violations of victim J.A.'s rights at a skateboarding park in Compton in April 2020.  Defendant, who was then a deputy with the Los Angeles County Sheriff's Department ("LASD") and Vega's partner that day, bears similar responsibility for the shocking mistreatment and false imprisonment of J.A. and the subsequent web of lies the co-defendants concocted to cover up their misconduct.  And defendant similarly must account for

1

the degradation of trust in law enforcement wrought by his actions. As this Court explained during Vega's sentencing, law enforcement officials must be held to a higher standard.

Nonetheless, in fashioning the appropriate and individualized sentence for defendant, two principal factors distinguish his conduct from Vega's.  First, as described more fully herein, defendant did not spearhead the violations of J.A.'s rights to the same degree as Vega, including at the outset of the day's events.  Second, as the government explains in section IV below, defendant cooperated post-indictment and the government is moving for a five-level departure for his substantial assistance pursuant to U.S.S.G. § 5K1.1.

The government concurs with the United States Probation and Pretrial Services Office's ("USPO") Guidelines calculations as set forth in its Presentence Investigation Report ("PSR").  However, the government submits that the applicable post-5K1-departure Guidelines range in this case should be 10 to 16 months.  With that Guidelines range and the broader goals of sentencing in mind, the government recommends the following sentence: (1) a 12-month term of custody; (2) a 3-year term of supervised release; (3) a fine (if any) to be determined by the Court;[1] and (4) a special assessment of $100.

## II.  DEFENDANT'S OFFENSE CONDUCT

The government previously summarized the underlying facts in connection with co-defendant Vega's sentencing on December 11, 2023.[2]

---

[1] The PSR finds that defendant does not appear to have the ability to pay a fine.  (PSR (Dkt. No. 47) ¶ 102.)

[2] Vega pled guilty, pursuant to a plea agreement, to deprivation of rights under color of law (18 U.S.C. § 242) on September 6, 2023. (Dkt. Nos. 50, 52.)  On December 11, 2023, this Court sentenced Vega to 24 months' imprisonment, a $5,000 fine, three years of supervised release, and a $100 special assessment.  (Dkt. Nos. 62, 63.)

Here, the government describes the offense conduct with a focus on
defendant's role and perspective during the events at issue.[3]

On April 13, 2020, defendant, who was then a sworn deputy
assigned to the LASD's Compton Station, was on patrol with his
partner, Vega.  Defendant and Vega were in an LASD sports utility
vehicle (the "SUV") near Wilson Park in Compton.  Shortly after 2:30
p.m., defendant noticed two young African-American males, one of whom
he believed to be on probation, inside the park near a skateboarding
park (the "skatepark") enclosed by a tall wrought-iron fence within
Wilson Park.  Defendant and Vega ordered the young males to lift up
their shirts, and they complied.  J.A., an avid skateboarder who was
among 10 to 15 people within the skatepark, yelled at the deputies to
leave the young males alone, but J.A. did not threaten defendant,
Vega, or anyone else in the park.  As defendant stood by, an enraged
Vega yelled back at J.A., saying "shut the fuck up, bitch" (or
similar words).  Vega then challenged J.A. to a fight and continued
to threaten and exchange profanities with J.A.

Rather than stepping in to de-escalate the situation or
counseling his partner to ignore J.A. (who posed no danger
whatsoever) and move on, defendant joined Vega as they approached
J.A., who was on the other side of the skatepark fence.  Defendant
stood guard as Vega grabbed J.A. through a small opening in the
fence, detained J.A., and put J.A. in the backseat of the SUV.
Several of the onlookers within the skatepark, all of whom were
separated from defendant and Vega by the tall fence and at no time

---

[3] Unless otherwise indicated, all facts herein are drawn from
the PSR and the Factual Basis contained in the parties' plea
agreement.  (See Dkt. No. 42 at ECF-stamped pages 21-30; Dkt. No. 47
¶¶ 14-40.)

3

posed a risk to the deputies, filmed the encounter on cellphones, in
disbelief at the unfolding events.  When someone asked what J.A. had
done wrong, defendant, following his partner's lead instead of the
law, responded: "[J.A.] challenged [us] to a fight, that's a crime."[4]
Defendant knew full-well that his assertion was false, as, in fact,
his partner Vega had challenged J.A. to a fight merely because J.A.
(correctly) told the deputies to leave the young African-American
males alone.  Defendant further knew that he and Vega had no lawful
basis whatsoever to detain or arrest J.A. at that or any point.

Despite knowing that what he and Vega were doing was wrong, and
illegal, defendant helped Vega confine and falsely imprison J.A. in
the backseat of the SUV.  Leaving no doubt their actions were
unlawful, neither deputy informed J.A. that he was under arrest, read
J.A. his rights, or even buckled J.A.'s seatbelt.  Committed to
seeing out their crime and teaching J.A. a lesson he would not soon
forget, defendant and Vega drove away from the park and proceeded to
taunt and terrorize J.A.  Vega took the lead, again challenging J.A.
to a fight, threatening to "fuck [J.A.] up" (or similar words), and
alluding that the deputies were going to drop off J.A. in gang
territory where J.A. would be beaten up.  Again, rather than put an
end to the illegal detention and intimidation of J.A., defendant (who
towers over Vega and everyone else he encounters) followed Vega's
lead, saying that he, too, would beat up J.A. if they fought.

While still in the SUV, Vega told J.A., "you must be on
something the way you're talking to me," or words to that effect.

---

[4] One of the onlookers recorded the encounter on a cellphone and
captured defendant's statement in video footage, which was produced
in discovery and provided to the Court.  (Dkt. Nos. 40-41.)

4

Defendant immediately understood Vega to be implicitly proposing a false pretext (illegal substance abuse) for their unlawful detention. Defendant picked up on Vega's signal and went along with it, agreeing to falsely allege that J.A. was under the influence of drugs.

The deputies' taunts, threats, and bullying were only interrupted when Vega saw and began pursuing a young male on a bicycle down a narrow alleyway in the SUV after the male purportedly had grabbed at his waistband.  Defendant got out of the SUV to take a containment position on the street before Vega's pursuit in the alley, knowing that J.A. remained unsecured in the SUV.  Consistent with his earlier complicity, defendant did not caution his partner against initiating a chase with an innocent and unbuckled civilian trapped in the backseat.  Soon after, defendant heard a loud crash, as Vega collided with a parked car and the alley wall.  As defendant would eventually find out, J.A. hit his head and face inside the SUV, sustaining a cut above his eye that later required stitches.

Defendant heard Vega report over LASD radio the pursuit of a fleeing (purported) gun suspect and Vega's involvement in a traffic collision.  Vega did not inform other LASD personnel that J.A. had been in the SUV at the time of the collision; defendant, for his part, did not use his mobile radio to correct that critical omission.

When defendant found Vega near the damaged SUV in the alley, defendant asked Vega where J.A. was.  Vega said he had "kicked" J.A., i.e., told J.A. to flee the scene.  Defendant responded that Vega was an "idiot" for letting J.A. go -- the implication being that releasing J.A. had undermined the deputies' ability to control the narrative and advance the cover story they tacitly agreed upon in the

SUV.  In fact, although defendant and Vega did not know it at the time, other responding deputies who were looking for the purported gun suspect independently came upon and re-detained J.A. on a neighboring street, mistakenly believing J.A. was the gun suspect. (Neither the supposed gun suspect nor a gun were ever found.)

A supervising sergeant eventually met up with defendant and Vega in the alley and asked if they were okay.  While the deputies told the sergeant that defendant had not been in the SUV at the time of the collision, neither defendant nor Vega informed the sergeant that they had (illegally) detained J.A. earlier in the day and that J.A. had been in the SUV when Vega drove it into the alley wall. Defendant knew this information would have been important to the sergeant and that it was wrong to conceal it.  He did so, however, because he feared that disclosing it would get Vega and him in trouble because, among other things, they had violated J.A.'s rights and LASD policy by falsely imprisoning him.

Faced with the reality that other deputies had independently re-detained J.A., Vega ultimately told those deputies, and then the supervising sergeant, that J.A. had been in the back of the SUV when it crashed.  But, in an act of pure self-preservation, defendant and Vega then doubled-down on their criminal conduct and put their agreed-upon false cover story into full-throttle.  Vega lied to the supervising sergeant that the deputies had detained J.A. at the park because they believed J.A. was under the influence of a stimulant. And defendant called another deputy that had escorted J.A. to the hospital and instructed the deputy to issue a bogus citation to J.A.

for being under the influence of methamphetamine, charging J.A. with a crime defendant and Vega knew J.A. did not commit.

Later the same evening, defendant and Vega tripled-down on their misconduct and committed their cover-up and lies to writing, submitting two separate incident reports replete with falsifications and fabrications of the day's events.  Defendant worked together with Vega, with deliberation and intention, to frame J.A. and falsely justify their constitutional violations.  Among other things, defendant and Vega cooked up numerous "facts" about J.A.'s supposed pugnaciousness and signs and symptoms of being under the influence of a stimulant at Wilson Park.  The deputies also fabricated details about the other onlookers at the park encroaching on them to justify their quick departure with J.A. unsecured and unhandcuffed in the back of the SUV.  In their most easily-provable lie, the deputies fabricated the circumstances surrounding Vega directing J.A. to flee the scene, falsely stating that Vega had checked J.A. for injuries and transferred J.A. to another responding unit.  Defendant knew these were all lies, and he told them (as had Vega) to protect himself, all at the expense of J.A. and the integrity of defendant's position as a law enforcement officer sworn to protect the public.

**III. THE USPO'S GUIDELINES CALCULATIONS**

   **A.   Offense Level and Criminal History Category**

Applying the 2021 Guidelines Manual,[5] and consistent with the parties' plea agreement (Dkt. No. 42, ¶ 16), the USPO calculated the

---

   [5] The USPO used the 2021 Guidelines Manual instead of the 2023 Guidelines Manual, the latter of which took effect on November 1, 2023.  The USPO's inadvertent use of the 2021 Guidelines Manual has no practical impact on the calculations here, as the relevant offense
*(footnote cont'd on next page)*

7

total offense level for defendant's offense of conviction (18 U.S.C.
§ 371) and relevant conduct as 17, as follows:

| | | |
|---|---|---|
| Base offense level: | 12 | [U.S.S.G. § 2X1.1(a), U.S.S.G. § 2H1.1(a)(2)] |
| Defendant was a public official at the time of the offense; offense was committed under color of law: | +6 | [U.S.S.G. § 2X1.1(a), U.S.S.G. § 2H1.1(b)(1)] |
| Obstructing or impeding the administration of justice: | +2 | [U.S.S.G. § 3C1.1] |
| Acceptance of responsibility: | -3 | [U.S.S.G. § 3E1.1] |
| <u>Total offense level:</u> | <u>17</u> | |

(PSR ¶¶ 45-61.)  The government agrees with these offense level
calculations, subject to its motion for a downward departure pursuant
to U.S.S.G. § 5K1.1 discussed below.

Although defendant has a prior misdemeanor conviction for
driving under the influence from March 25, 2010 -- just over ten
years before his commission of the offense here -- the USPO correctly
found the conviction has timed out for purposes of criminal history
points.[6]  (PSR ¶ 66.)  Given defendant has zero criminal history
points, the government agrees that defendant falls into Criminal
History Category I.  (<u>Id.</u> ¶ 68.)

**B.   Zero-Point Offender Reduction Does Not Apply**

The 2023 Guidelines Manual contains a new "Adjustment for
Certain Zero-Point Offenders," under U.S.S.G. § 4C1.1.  In order to
qualify for this two-level reduction from the total offense level, a

---

level factors have not changed from the 2021 version to the 2023
version of the Guidelines.  And the new Zero-Point Offender reduction
under U.S.S.G. § 4C1.1 should not apply, as explained further herein.

[6] The conviction also appears to have been expunged. (PSR ¶ 66.)

1  defendant must have no criminal history points and must meet all of

2  the eligibility criteria set forth in U.S.S.G. § 4C1.1(a).

3  Defendant does not qualify for this two-level reduction for

4  three reasons.  Defendants who commit civil rights violations, like

5  defendant here, are barred from receiving the credit.  See U.S.S.G.

6  4C1.1(a)(8) (one of eligibility factors requires that "the instant

7  offense of conviction is not covered by [U.S.S.G.] § 2H1.1 (Offenses

8  Involving Individual Rights)[.]")  As the parties agreed in the plea

9  agreement and the USPO found in the PSR, Guidelines section 2H1.1, by

10  way of section 2X1.1, applies to the offense of conviction in this

11  case, as defendant conspired to deprive J.A. of his constitutional

12  rights under color of law.  This factor, standing alone, disqualifies

13  defendant from receiving the reduction.

14  In addition, defendant (and Vega) used "credible threats of

15  violence in connection with the offense," in contravention of

16  U.S.S.G. 4C1.1(a)(3), including threatening to beat up J.A. while he

17  was confined in the SUV and to drop off J.A. in gang territory where

18  J.A. would be beaten.  Finally, as a result of the criminal plan, the

19  offense resulted in J.A. sustaining "serious bodily injury,"

20  "requiring medical intervention such as . . . hospitalization,"

21  barring application of the reduction as well.  See U.S.S.G.

22  §§ 4C1.1(a)(3), (a)(4); see also U.S.S.G. § 1B1.1 cmt. n.1(M).

23  Thus, as the USPO correctly calculated, defendant's total

24  offense level (prior to any departure) is 17.

25  **C.   Advisory Guidelines Range Before Departure**

26  The government concurs with the USPO's calculation that, based

27  on total offense level 17 and Criminal History Category I, the

28
                                     9

resulting advisory Guidelines range is 24 to 30 months.  (Id. ¶ 106.)

However, as explained further in the next section, the government moves for a downward departure of five-levels pursuant to U.S.S.G. § 5K1.1.  After applying the recommended departure, the resulting offense level of 12 and CHC I yields an advisory Guidelines range of 10 to 16 months.

**IV.  GOVERNMENT'S MOTION FOR DOWNWARD DEPARTURE PURSUANT TO SECTION 5K1.1**

Pursuant to U.S.S.G. § 5K1.1, the government moves the Court to depart downward five levels to reflect defendant's substantial assistance to law enforcement. █████████████











* * * * *

In light of the foregoing, the government submits that a five-level departure under U.S.S.G. § 5K1.1 is warranted and appropriate, and hereby moves for such a departure.

## V.   THE GOVERNMENT'S SENTENCING RECOMMENDATION

Based on a post-departure advisory Guidelines range of 10 to 16 months (offense level 12 and CHC I), the government believes a within-Guidelines sentence of 12 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing. United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008).  This sentence sufficiently reflects the seriousness of defendant's grievous violation of the public trust and fulfills the other sentencing objectives under 18 U.S.C. § 3553(a) while also appropriately accounting for defendant's substantial assistance, his relative culpability compared to his co-defendant, and his personal history and characteristics.

### A.   The Nature and Circumstances of the Offense

As the Court recognized in sentencing co-defendant Vega, the gravity of defendant's violation of his solemn oath to uphold the law and serve the public cannot be overstated.  At every step of the way on April 13, 2020, defendant knew that he and Vega were violating J.A.'s rights and abusing their awesome power as deputies in numerous ways.  Defendant did so to harass an innocent person who dared to question defendant and Vega's aggressive policing in the park.  And he continued to do so to cover up his crimes and protect himself, instead of the community (including J.A.) he was sworn to safeguard and defend.

From the outset, as Vega's verbal abuse of J.A. in the park accelerated from words to threats to action, defendant understood that Vega was in the wrong and had started down a path of grossly abusing his position.  Defendant joined and reinforced Vega when it was his duty, as an officer charged to uphold the law and protect the innocent, to intervene and de-escalate the situation.  When Vega grabbed and confined J.A. in the back of the SUV, defendant announced the initial false pretext (i.e., J.A. purportedly challenging the deputies to a fight) to J.A. and the bewildered onlookers questioning the deputies' illegal conduct.  In that moment, as the deputies' conspiracy began to take shape, defendant joined Vega down the path of irreparably harming J.A. and violating their solemn oath to protect and serve the public.

Defendant had numerous opportunities to course-correct.  Vega drove the SUV away from Wilson Park with J.A. confined in the back and continued to verbally abuse J.A. ("I'll fuck you up"), who had never been read his rights or told he was under arrest.  Rather than imploring his partner to let J.A. go after the initial violation of J.A.'s rights (especially after they no longer had the audience of onlookers in the park), defendant joined Vega in threatening to beat up J.A. in the SUV.  When Vega signaled to defendant the false allegation that J.A. was under the influence of drugs (asking J.A. whether he was on medications), defendant sat idly by and soon after embraced and emboldened this fabricated cover story.  When Vega began to chase another purported suspect on a bicycle, defendant deserted J.A. in the SUV, knowing J.A. still was confined and precariously unsecured in the backseat in what was an extremely dangerous

17

situation.  And after defendant found out that Vega had "kicked" J.A. from the SUV after the traffic collision, rather than come clean to their supervisor, defendant said nothing and joined Vega in lying to other LASD personnel and covering up their misconduct.

Defendant then worked hand-in-hand with Vega to memorialize (and give further credence to) the deputies' lies and core breaches of their oaths as law enforcement officers, hours after the initial ambush of J.A. in the park.  Defendant instructed another deputy to issue a sham criminal citation to J.A. while J.A. was in the hospital because of defendant and Vega's misconduct.  Defendant later sat down with Vega and, with reflection and intention, concocted a slew of lies across two incident reports to save himself.  At all times, defendant knew the correct course, but he never took it.  J.A., and the deputies' grave violation of J.A.'s rights, became an inconvenient "problem," and defendant exploited his position of authority and trust to try to make the problem go away.

That said, in the individualized assessment of sentencing, it is important to acknowledge the defendant's relative culpability compared to co-defendant Vega.  At the skatepark, Vega (not defendant) initially verbally abused J.A. and challenged J.A. to a fight.  Vega (not defendant) grabbed J.A. and put him in the patrol vehicle, as defendant looked on.  Vega (not defendant) came up with the plan to falsely allege J.A. was under the influence.  Vega (not defendant) initiated an ill-advised vehicle pursuit while J.A. was still trapped in the back of the SUV.  Vega (not defendant, who was not present) instructed J.A. to flee the scene after the collision, without checking J.A. for injuries.  And Vega (not defendant)

committed the deputies to the lie about J.A. being under the influence of a stimulant when Vega eventually told their supervising sergeant, falsely, that offense was the reason J.A. was in the backseat of the SUV.  None of these distinguishing points in any way excuse defendant's actions or call into question his full awareness of the illegality of his conduct.  But they are nonetheless part of the factual record and necessary to consider in the overall sentencing analysis of defendant as compared to Vega.

In sum, the nature and circumstances of the offense -- here, the conspiracy to deprive J.A. of his rights, to tamper with a supervising personnel witness, and to falsify reports to cover up the underlying misconduct -- reflect gravely serious misconduct warranting a meaningful within-Guidelines sentence.  But, compared to Vega, defendant's conduct was somewhat less culpable.

**B.    History and Characteristics of Defendant**

In addition to the information set forth in section IV above regarding defendant's substantial assistance, defendant's background and characteristics provide additional mitigating circumstances of note in determining defendant's sentence.

According to defendant's brother, with whom defendant reportedly shares a close relationship, defendant always wanted to be a law enforcement officer.  (PSR ¶ 80.) ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████[10]  Defendant appears to

---

[10] Defendant also appears to have conveyed to the USPO that he takes full responsibility and makes no excuses for his conduct, and that he has reflected on the mental and emotional toll his actions must have caused J.A. to suffer.  (PSR ¶ 44.)

19

have had a stable upbringing and the support of his parents and
brother in pursuing his career goal, and he studied criminal justice
at community college to that end.  (Id. ¶¶ 74-75, 87.)  Defendant's
offense conduct here is all the more troubling, and in some ways
confounding, in light of his apparent longstanding objective to serve
the public in law enforcement, especially after realizing his goal in
2007 when he started working at the LASD.  (Id. ¶ 92.)  Going
forward, defendant reports that he plans to attend trade school to
obtain a Class A driver's license, and he appears to have the ongoing
support of not only his parents and brother, but also his wife, minor
son, and wife's parents.  (Id. ¶¶ 74, 79, 90.)

Defendant's history and characteristics, and his cooperation as
discussed above, mitigate, in the government's estimation, against a
high-end Guidelines sentence in this case.

## C. Deterrence

Deterrence is a very significant sentencing factor here.  As the
government made clear in its sentencing position as to Vega, and as
the Court recognized during Vega's sentencing hearing, law
enforcement officers hold a special station in our society.  By
virtue of their significant power and discretion, and the high volume
of contacts they have with people on a daily basis, there is,
unfortunately, considerable opportunity for abuse of their position.
Defendant's conduct in this case, from seeking to teach J.A. a lesson
to then pulling all the strings available to him and his partner to
cover up their misconduct, typifies abuse that can fester without
meaningful consequences.  The group of would-be wrongdoers -- i.e.
bad actors in law enforcement -- is specific and (hopefully) small.

20

Given this case's attendant publicity, the sentences here should reach this captive audience and have a lasting impact on the everyday activities and decisions of law enforcement going forward.

The 24-month sentence imposed on co-defendant Vega put teeth into the prosecution of law enforcement officers for deprivations of rights and misuse of their authority.  A 12-month custodial sentence here, a similarly meaningful sentence in consideration of defendant's substantial assistance and his comparative role in the scope of this offense, will further deter other law enforcement officers from abusing their power, aiding other officers who do so, and violating their sworn oath to uphold the law.

**D.   Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense**

The sentence similarly must provide just punishment and promote respect for the law by demonstrating that law enforcement officials' abuse of their authority will not be tolerated.  Defendant's and Vega's vigilante acts and chain of lies eroded -- and continues to erode -- the public's trust in law enforcement to uphold the law and stand on the side of right.  The vast majority of officers who put on a badge every day are, undoubtedly, on the side of right, but they nonetheless suffer, both reputationally and in their daily interactions with an increasingly skeptical public, at the hands of those who undermine the public trust.  That trust is not easily mended.  But holding the officers accountable who, in the public eye, violate it is critical to reflecting the seriousness of those breaches of the public trust, promoting respect for the law, and providing just punishment.

So too should other law enforcement officials be encouraged, both proactively and even after their conduct is first called into question, to be a part of the solution and not the problem.  The government seeks to strike the right balance in this case between a meaningful custodial sentence but one that accounts for the benefits law enforcement officials can obtain for doing the right thing.

### E.   Avoidance of Unwarranted Sentencing Disparities

As a general matter, a within-Guidelines sentence helps avoid unwarranted sentencing disparities among defendants with similar criminal backgrounds who commit similar offenses.  See 18 U.S.C. § 3553(a)(6).  The advisory Guidelines range provides the "starting point and . . . initial benchmark" for this Court's consideration of an appropriate sentence.  Molina-Martinez v. United States, 136 S.Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)).  Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

The government's requested five-level departure in this case, of course, would reduce the applicable advisory Guidelines range from 24-30 months to 10-16 months' imprisonment.  The government's sentencing recommendation of 12 months is within that range.  Any

disparity between defendant's sentence and those of offenders

engaging in similar misconduct (including Vega) would not be

unwarranted, however, by virtue of defendant receiving the benefit of

his substantial assistance in this case.

**F.    Victim Impact**

J.A. provided a Victim Impact Statement, which the government

previously submitted as an exhibit to its sentencing position for co-

defendant Vega.  The government reattaches J.A.'s statement here as

Exhibit A, as J.A.'s words carry the same weight and import with

respect to how defendant's violations of J.A.'s rights affect J.A. to

this day.  J.A. speaks to how the "devastating situation" of his

false imprisonment traumatized him and stole his "motivation &

spirit," describing the numerous ways defendant and Vega's crimes

impacted his day-to-day life.  But J.A. also reflects more broadly on

how the abuses of officers such as defendant and Vega erode his

community's "trust in the police," with the assumption that "there

are a lot of people like Hernandez & Vega."  J.A.'s statement thus

reinforces how law enforcement misconduct not only profoundly harms

individual victims but also stains the reputation and undermines the

effectiveness of the law enforcement community more broadly.

**G.    Restitution**

Although restitution is not mandatory in this case because

defendant's offense of conviction did not constitute a crime of

violence, an offense against property, or another qualifying offense,

see 18 U.S.C. §§ 3663A(a)(1), (c), the government is mindful of the

Court's ability to make victims whole through restitution, see 18

U.S.C. § 3663, and that "the need to provide restitution to any

victims of the offense" is one of the goals of sentencing. <u>See</u> 18 U.S.C. § 3553(b)(7). Having said that, J.A. entered into a confidential settlement agreement with the County of Los Angeles that covered injuries and expenses sustained by J.A. by virtue of defendant's conduct. To date, J.A. has not informed the government of any additional uncovered expenses J.A. has incurred because of defendant. Accordingly, the government is not aware of any restitution in this case at this time.

**H.   Objections/Corrections to the PSR**

As previously explained, the government agrees with the USPO's advisory Guidelines calculations set forth in the PSR in this case (before accounting for the government's motion for a downward departure). Nonetheless, the government provides several corrections or clarifications with respect to the PSR as follows:

- Paragraph 12 states "Trial pending" for co-defendant Miguel Angel Vega, as such was the case when the PSR was initially filed on August 23, 2023. Given the current posture of the case, the government notes that the PSR now should state in this paragraph that Vega was sentenced on December 11, 2023 to 24 months' imprisonment, 3 years of supervised release, a $5,000 fine, and a $100 special assessment.

- In paragraph 18, the first sentence incorrectly states that "[a]pproximately 1 to 15 people were inside the enclosed skatepark . . . ." As set forth in the factual basis to the parties' plea agreement, this sentence should reflect "10 to 15 people" instead of "1 to 15 people."

- The PSR incorrectly states in paragraphs 41 and 118 that

24

the Mandatory Victim Restitution Act (MVRA), 18 U.S.C.
§ 3663A, applies to the offense of conviction in this case.
As previously noted, none of the enumerated grounds or
offenses for applying the MVRA are present in this case,
see 18 U.S.C. §§ 3663A(a)(1), (c), including the ground of
a crime of violence as defined in 18 U.S.C. § 16.  Thus,
the non-mandatory restitution provisions of 18 U.S.C.
§ 3663 apply here instead.  In addition, the government
previously provided the USPO with information about J.A.'s
confidential settlement agreement with the County of Los
Angeles that covered injuries and expenses sustained by
J.A. by virtue of defendant's coconspirator Vega's conduct,
at least as of the time of the settlement.

- Paragraph 105 inadvertently repeats "18 U.S.C. § 371"
  twice.

## VI.  CONCLUSION

For the foregoing reasons, the government respectfully requests
that this Court impose the following sentence as to defendant
Christopher Blair Hernandez: (1) a 12-month term of imprisonment;
(2) a 3-year term of supervised release; (3) a fine (if any) to be
determined by the Court; and (4) a special assessment of $100.

# EXHIBIT A

My name is ███ A███, a survivor of a devastating situation that I have had to live through. I was 23 years old at the time, striving to be my best self, waking up early mornings trying to achieve my goals step by step. Until one day, I was taken of my motivation & spirit do to the trauma that these deputies had caused to my mental health. From being myself to losing myself.. feeling empty, staying up late nights having to think of what they did to me. Remincing on how often I would be outside socializing with friends & family to suddenly, feeling anger & wanting to be alone to myself. I never understood why they chose to do what they did to me. The fact that they tried to frame me as a drug user with no proof at all, forcefully making me sign a ticket that spoke lies.. Accusing me of being under the influence of meth after wrongfully throwing me in a sheriff vehicle to continue to reveal the true colors that they hide beneath that uniform they abide by. I don't stand here to hate those who protect & serve our communities as they should. I stand here to say that there are a lot of people like Hernandez & Vega, that are working in the department of Law Enforcement till this day.. That do not know how to de-escalate or show propper intentions in a situation of despair. I myself, am still working on getting comfortable being in public places. I'm back on my skateboard trying to be consistent but get back pains from the crash that happened in that alleyway. I grew up going to Wilson Skatepark in Compton California since I was a young kid to stay away from trouble. A passion I grew to love about skateboarding because of the connection we all share. A community built around us to try & live through peace around a city where most of us, hardly even hold trust in the police. As I've said before, "I thought these catastrophies only happened in movies." It may sound insane to realize stories like this exsist, but understand.. These situations are real. I hope for change, I hope for justice to be served. Rest in peace to Andres Guardado, for the same deputies that harassed me, fatally shot this young man on the back while on his knees with hands behind his head 7 times.. I simply say, what comes around goes around.. Always think twice before taking action to do something you'll end up regretting. For it is not just a particular individual that you're hurting.. But a community that cares as well..